# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
March 24, 2015 Session


## STATE OF TENNESSEE v. CURTIS SCOTT HARPER


**Appeal from the Criminal Court for Knox County**
**No. 99747      Mary B. Leibowitz, Judge**

_____


**No. E2014-01077-CCA-R3-CD – Filed November 3, 2015**

_____


A Knox County jury found Curtis Scott Harper ("the Defendant") guilty of three counts of vehicular homicide by intoxication, three counts of vehicular homicide by creating a substantial risk of death and serious bodily injury, one count of reckless endangerment, one count of tampering with evidence, one count of leaving the scene of an accident, one count of driving under the influence, and, in a subsequent deliberation, one count of driving under the influence (second offense). The trial court sentenced the Defendant to an effective thirty years' incarceration. On appeal, the Defendant claims that: (1) the introduction of fifty crime scene and autopsy photographs, many of which were gruesome, graphic, or horrifying, deprived the Defendant of a fair trial by inflaming the passions of the jury; (2) the State presented false expert testimony concerning the speed of the Defendant's vehicle, thereby depriving the Defendant of due process; (3) the State violated Rule 16 of the Tennessee Rules of Criminal Procedure and Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide to the Defendant a copy of the article the forensic pathologist relied upon during his testimony; (4) the prosecutor engaged in improper argument, including personal attacks on defense counsel, that violated the Defendant's right to a fair trial; (5) the trial court erred in imposing partial consecutive sentences; and (6) the cumulative effect of the error requires a new trial. After a thorough review of the record, we conclude that the trial court abused its discretion in admitting numerous graphic and gruesome crime scene and autopsy photographs, the prejudicial effect of which far outweighed their probative value, and such error was not harmless. We, therefore, reverse the judgments of the criminal court and remand the case for a new trial.

**Tenn. R. App. P.3 Appeal as of Right; Judgments of the Criminal Court Reversed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined. JOHN EVERETT WILLIAMS, J., filed a separate concurring opinion in which NORMA MCGEE OGLE, J., joined.

Alexander Little, IV and Edward M. Yarbrough (on appeal), Nashville, Tennessee, and James W. Price and William Timothy Hill (at trial), Nashville, Tennessee, for the appellant, Curtis Scott Harper.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Randall E. Nichols, District Attorney General; Sarah W. Keith and William H. Crabtree, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

This is a tragic case for everyone involved. In the early morning hours of May 30, 2012, Nelzon Soto and Chasity Thornell were struck and killed by a vehicle driven by the Defendant. Ms. Thornell was twenty-two weeks pregnant, and her fetus was also killed.

Ms. Thornell had been riding with Sarah Tinder on Washington Pike, a two-lane highway in Knoxville, when Ms. Tinder's car ran out of gas. While they were waiting for a friend to bring them some gasoline, Mr. Soto, who lived on Washington Pike, returned home from work and offered to help Ms. Tinder with her vehicle.

At approximately 1:47 a.m., the Defendant was returning to his apartment from a pub called The Hill. As the Defendant drove down Washington Pike in his Ford Explorer, he came upon Ms. Tinder's disabled vehicle in his lane of travel. Ms. Tinder's car was parked at an angle, with the front passenger's side of the vehicle closer to the curb than the rear of the vehicle. Ms. Tinder's vehicle was blocking the Defendant's lane of travel. The only light in operation on the vehicle was the passenger's side rear blinker. The rear lights on the driver's side of the vehicle were not working. Mr. Soto and Ms. Thornell were standing in the road on the driver's side of the disabled vehicle.

According to the Defendant, as he passed Atoka Lane, he saw Ms. Tinder's vehicle "right in front of [him], right in [his] lane." The Defendant swerved to avoid the stalled vehicle and heard a loud crash. He did not stop initially but continued to the next intersection where he stopped to inspect the damage to his vehicle. He claimed he did not see the victims standing in the roadway and thought that he hit the vehicle. He claimed he panicked and drove to his nearby apartment. However, the Defendant did not

hit Ms. Tinder's vehicle. He struck Mr. Soto and Ms. Thornell, and Ms. Thornell's fetus was ejected from Ms. Thornell's body by the force of the impact. Other than the Defendant, the only witness to the accident was Ms. Tinder, who died of unrelated causes before trial.

The Knox County Grand Jury subsequently issued a presentment, charging the Defendant with the following offenses:

| Count | Charge | Victim |
|---|---|---|
| 1 | Vehicular Homicide by Intoxication | Nelzon Soto |
| 2 | Vehicular Homicide by Intoxication | Chasity Thornell |
| 3 | Vehicular Homicide by Intoxication | Unborn Child of Chasity Thornell |
| 4 | Vehicular Homicide by Creating a Substantial Risk of Death and Serious Bodily Injury | Nelzon Soto |
| 5 | Vehicular Homicide by Creating a Substantial Risk of Death and Serious Bodily Injury | Chasity Thornell |
| 6 | Vehicular Homicide by Creating a Substantial Risk of Death and Serious Bodily Injury | Unborn Child of Chasity Thornell |
| 7 | Tampering with Evidence | n/a |
| 8 | Reckless Endangerment | Sarah Tinder |
| 9 | Leaving the Scene of an Accident Resulting in Injury or Death | n/a |
| 10 | Driving Under the Influence | n/a |
| 11 | Driving Under the Influence (Second Offense) | n/a |

Although the Defendant has not challenged the sufficiency of the evidence on appeal, we find it necessary, based upon the issues that are raised, to review and summarize the evidence presented at trial.

*State's Case-in-Chief:*

Dennis Williams, a truck driver who was in the area of the accident in the early morning hours of May 30, testified that he observed an SUV sitting "at the corner of

Alice Bell and Washington" with "extensive damage to the [] front driver's side and the front end." There was a "college age" man standing by the vehicle. After determining that the man was all right, Mr. Williams proceeded in a different direction from where the accident had occurred.

Cody King, a Washington Pike resident, testified that he was watching television when his brother yelled that someone was "screaming for help." Mr. King ran outside and saw Ms. Tinder standing in the road, indeed "screaming for help." Ms. Tinder was "absolutely . . . frantic"; she was crying and kept exclaiming, "I've never seen anyone drive that fast; I've never seen anyone drive that fast. I yelled for them to jump." Mr. King saw two bodies and determined, after checking the victims' pulses, that neither person was alive. While he was checking Mr. Soto for vital signs, Mr. King saw Ms. Thornell's fetus partially under Mr. Soto's body. Mr. King then called 911.

Knoxville Police Department (KPD) Officer Jason Gardner was the first officer to arrive on the scene. He spoke with Ms. Tinder who said a "larger silver or light-colored SUV" struck the victims. Officer Gardner located Mr. Soto's body approximately twenty or thirty feet from the front of Ms. Tinder's vehicle. There were visible wounds on Mr. Soto, and he was deceased. Officer Gardner next located Ms. Thornell's body. He testified that Ms. Thornell had a large wound to her abdomen, explaining, "[T]here was a rip in her stomach to where her insides were about out of her stomach and half laying on the pavement of Washington Pike." He also noted that "her hips and legs were twisted and broken." Officer Gardner called dispatch to request "a supervisor, major crimes investigator, crime lab and reconstruction team." When Officer Gardner walked back toward Ms. Tinder, he noticed a small set of legs, from what initially appeared to be a baby doll, underneath Mr. Soto's body. Officer Gardner then located a small head with an arm attached, which had been severed from the rest of Ms. Thornell's fetus. He described the fetus as having "fully developed hands, fingers, toes, mouth, eyes, ears and . . . hair on its head." He said the scene was littered with broken parts of a vehicle and bloody tire tracks. Officer Gardner stated the speed limit at that area of Washington Pike was "about 40 miles an hour—35 to 40." He stated there was a street light directly above Ms. Tinder's vehicle and that it was well-lit where her car was located. KPD Sergeant Stanley Cash, who also responded to the crime scene, stated that he had worked 500-600 crash scenes but that "this one was the worst [he'd] ever seen."

KPD Officer Samuel McLane testified that, when he arrived on the scene, Officer Gardner advised him of the suspect vehicle's description provided by Ms. Tinder. In an attempt to track down the hit-and-run vehicle, Officer McLane drove east on Washington Pike looking for evidence. He noticed fluid on the highway and followed the fluid to the intersection of Washington Pike and Alice Bell. Officer McLane turned right onto Alice Bell and noticed a piece of plastic in the roadway. He found what appeared to be blood

on the gray plastic, which he believed came from a fender well. The word "Ford" and a serial number were molded into the piece of plastic. He requested police dispatch to run the serial number and learned that the number "matched to a series year range of a Ford Expedition or Explorer."

KPD Officer Patricia Ward testified that she was on regular patrol in the area of the accident when she heard over the police radio that there had been a fatal crash on Washington Pike. Because she had experience in the traffic motor squad and prior training in accident investigation, she voluntarily responded to the scene. The Defendant objected to Officer Ward testifying as an expert or providing an opinion concerning the speed of the Defendant's vehicle. The trial court then conducted a jury-out hearing, during which Officer Ward testified she took no measurements at the crime scene, did not know the mass of the vehicle or the victims, and made no calculations. The trial court ruled Officer Ward could not testify as an expert under Tennessee Rule of Evidence 702. However, over the objection of the Defendant, the trial court allowed Officer Ward, after describing what she observed at the scene, to give a lay opinion pursuant to Tennessee Rule of Evidence 701. Before the jury, Officer Ward opined that the Defendant's vehicle "was traveling at a high rate of speed" at the time of impact with the victims. On cross-examination, Officer Ward was asked, "So you really don't have any way of determining speed from what you said, do you?" Her response was, "Not without measuring and calculating."

KPD Sergeant Tracy Hunter was qualified as an expert in "crash reconstruction." She testified that she arrived at the scene shortly after 2:00 a.m. Other officers had placed evidence markers at various locations. Sergeant Hunter marked the location of the victims with spray paint and set up "LTI" laser equipment to be used in mapping the scene. Using laser measurements, she completed a scale diagram of the scene showing the approximate point of impact based on a tire mark caused by "pedestrian loading on the [] suspension of the vehicle," the final resting location of the victims, and the location of various pieces of the vehicle and several items of clothing. To the right of the tire mark, Sergeant Hunter found a mark she said was made upon impact by the heel of Mr. Soto's shoe. Using the pedestrian loading tire mark as a benchmark, various measurements were taken. The final resting place of Mr. Soto's body was 123 feet from the tire mark. Ms. Thornell's body was 164.5 feet from the tire mark. Ms. Thornell's placenta was found almost ninety-seven feet from the tire mark. Sergeant Hunter also noted bloody drag marks that began several feet past the point of impact. Based on the final resting location of Ms. Thornell, the tire markings, and bloody drag marks, Sergeant Hunter testified:

> The tire markings are significant because it indicates to me that—it gives
> me the direction the vehicle was traveling. We believe based on our

investigation and evaluation of the evidence of the scene that upon initial impact [Ms. Thornell] was projected forward and then the vehicle struck her again and dragged her down the road. It's important to note that the— the tire mark on the left side doesn't go all the way up to the body. It stops right here which indicates to me that that's the point which the vehicle stopped but the body continued.

On cross-examination, Sergeant Hunter stated the impact point was somewhere near the rear corner of Ms. Tinder's vehicle. She agreed that the tire mark was caused because Mr. Soto's body "put force on [the Defendant's vehicle] and pushed [the Defendant's vehicle] out." She said Mr. Soto went up onto the hood of the Defendant's vehicle and broke the windshield. The blood mark left by the impact of Mr. Soto's body with the pavement began forty-seven feet from the pedestrian loading tire mark.

During her direct examination, Sergeant Hunter used several photographs from the crime scene to explain the measurements she took. The record indicates that, as the photographs were shown, family members of the victims began to cry. The trial court had to send the jury out and ask the upset family members to leave the courtroom. Outside of the jury's presence, the trial court commented, "If you can't remain, please step out . . . That's minor compared to what you are about to see, ladies and gentlemen." The trial court also stated:

> These are very graphic body part photographs. If there are any of you who cannot stay . . . go outside. But please—the jury cannot consider emotion. They must be able to listen to the evidence and the law and that only; that's how we work. Any problem that rises to a higher level will cause a mistrial, ladies and gentlemen.

On cross-examination Sergeant Hunter acknowledged the posted speed limit was 35 miles per hour. She also agreed that, if a vehicle was traveling at a constant speed of 35 miles per hour, it would travel 51.3 feet per second. Based on that calculation, and assuming that the Defendant was driving at a constant speed of 35 miles per hour, Mr. Soto was on the vehicle for less than one second.

KPD Officer Greg Womac was qualified as an expert in crash reconstruction. He testified that the scene's size was unusual, covering a long stretch of the roadway, which he described as a "straight, flat, normal two-lane road." Officer Womac stated there were three street lights in operation: "one at the corner just prior . . . to the stalled vehicle, one just past the stalled vehicle, and one . . . in front of the residence of the 911 callers." He identified various photographs from the crime scene and used those photographs to illustrate his testimony for the jury. Officer Womac stated that the drag marks from Ms. Thornell's body began 47.9 feet from the pedestrian loading tire mark. Based on Mr.

Soto's shoe mark and the injuries to Mr. Soto's right heel, Officer Womac concluded that Mr. Soto had his weight on his right foot and his back to the stalled vehicle with his left side facing the Defendant's vehicle at impact. He said Ms. Thornell was about one foot directly in front of and facing Mr. Soto. Upon impact, Mr. Soto did a "fender vault" with his body being thrown upward and outward toward the stalled vehicle. Officer Womac said most of Mr. Soto's body had left the Defendant's vehicle when his head struck the lower passenger side of the Defendant's windshield causing a "spider" crack in the windshield. Black hairs consistent with Mr. Soto's hair were found in the windshield. Blood was also found on the passenger side of the vehicle near the rear tire well. Mr. Soto's body was found near the right curb.

Officer Womac explained that, when Ms. Thornell was struck, her fetus was cut into two parts and ejected from her body. Most of the body of the fetus was ejected toward the right and was found partially under the body of Mr. Soto. The fetus's head and left arm were found on the roadway "just prior to Ms. Thornell's final rest[ing place]." Parts of Ms. Thornell's placenta were expelled from her body and landed on the roadway. Smaller pieces of tissue from all three victims were found on the Defendant's vehicle and on the roadway. Ms. Thornell was propelled forward and then hit a second time and dragged by the Defendant's vehicle. When Ms. Thornell's body came to rest, her left arm was "twisted unnaturally," and her hips and legs were distorted and "had obvious breaks in them."

Photographs of the roadway showed red drag marks, indicating downward pressure on Ms. Thornell's body from the Defendant's vehicle. Before the point where Ms. Thornell's body came to rest, the drag marks changed in appearance, becoming fainter and less red. Tire marks were found on both sides of the drag marks and stopped before the point where Ms. Thornell's body came to rest. According to Officer Womac, this evidence indicated that the Defendant's anti-lock brake system caused the vehicle's suspension to load, which made the vehicle dip and drag Ms. Thornell's body. When the vehicle came to a complete stop, the suspension reset and the vehicle lifted. However, Ms. Thornell's body still had momentum and was propelled forward in the roadway, which left fainter drag marks because there was nothing pushing her body into the pavement. According to Officer Womac, the only way the Defendant's vehicle could have continued in the direction it was traveling and avoided impacting Ms. Thornell's body a third time was for the Defendant to have driven around her body.

Officer Womac explained that speed in a pedestrian impact is determined by the distance the victim is "thrown" and that, because Ms. Thornell was hit a second time and her body was dragged by the vehicle, he could not estimate the speed of the impact vehicle. Officer Womac explained that, had the fetus been torn from Ms. Thornell's body when her body was dragged under the car, he would expect to find the fetal tissue in

the drag marks on the roadway. Instead, because no fetal tissue was found in the drag marks and the fetus's body was found near the side of the road and partially under Mr. Soto, he concluded that the fetus was expelled from Ms. Thornell's uterus on impact and followed the same trajectory as Mr. Soto.

After determining that the suspect vehicle was either a Ford Explorer or Ford Expedition, Officer Womac contacted the news media, which broadcast sufficient details to allow people with information to contact police. Officer Womac spent several hours tracking down leads that turned out not to be useful. He was then advised that a female friend of the Defendant had called and provided the Defendant's name and the location of his vehicle. Officer Womac proceeded to a residence on Gratz Street where he secured the Defendant's vehicle and called the crime lab. Officer Womac later contacted a wrecker service and had the vehicle towed to a secured area. Search warrants were then obtained for the vehicle, The Hill, and the Defendant's cell phone provider.

Officers who secured and towed the Defendant's vehicle from the Gratz Street residence noted that the right front and passenger side of the Defendant's vehicle had been extensively damaged, and they saw black hairs in the vehicle's broken windshield. Along with the Defendant's vehicle, the officers took several unopened trash bags to the police station. Once there, they searched the bags and found a Budweiser bottle and a crushed beer can. When they searched the Defendant's vehicle, they found a "koozie." Investigators at the crime lab also found human tissue underneath the Defendant's vehicle, around the engine compartment and front suspension, confirming that Ms. Thornell's body had been dragged by the vehicle. Officer Womac used photographs of the damage to the Defendant's vehicle to show the point of impact for both Ms. Thornell and Mr. Soto.

Officer Womac testified that, as part of his investigation, he recreated the accident by having a crime lab technician, who had not been involved in the investigation or seen the photographs taken at the scene, drive a Ford Explorer down Washington Pike at night. Another crime lab technician, Officer Beth Goodman, rode as a passenger and operated a video camera. A vehicle similar in size, shape, and color to Ms. Tinder's vehicle was parked in approximately the same location as her stalled vehicle had been with only the right blinker in operation. The technician was instructed to drive as close to 35 miles per hour as possible. The technician first observed the flashing light from a distance of 1,047 feet. She was able to tell that a vehicle was in the roadway at 429 feet. Her speed was clocked by radar at 34.5 miles per hour. At Officer Womac's request, the technician made a second run. This time, without advising the technician, Officer Womac had two people, dressed in similar colored clothing as Mr. Soto and Ms. Thornell, stand in the roadway. Again, the technician saw the flashing lights from over 1,000 feet. The technician saw the pedestrians in the roadway from 567 feet away. She was clocked this

time at 37 miles per hour. According to Officer Womac, based on industry standards, it takes the average person 1.6 seconds to react and apply the brakes, and a vehicle traveling at 35 miles per hour would travel 82.9 feet in 1.6 seconds. Again applying industry standards, Officer Womac opined that using a "drag factor" of .7 it takes a vehicle traveling at 35 miles per hour 2.27 seconds to come to a stop after the brakes are applied, during which time the vehicle would travel 58.33 feet before coming to a complete stop. The combined reaction time and braking time would be 3.87 seconds, during which time the vehicle would travel 141.23 feet. Returning to the incident, Officer Womac testified he found no evidence of braking before impact.

On cross-examination, Officer Womac agreed that the technician driving the vehicle in the recreation was instructed to tell Officer Goodman the moment she saw something in the road. He also stated that there was some evidence that Ms. Thornell and Mr. Soto were hugging at the time of impact, and he could not rule that out because they were very close together. Officer Womac further agreed that, on the morning of the incident, defense counsel telephoned him and offered to turn in the Defendant. Officer Womac told defense counsel to wait until he obtained an indictment. When the indictment was obtained, the Defendant turned himself in.

Tennessee Bureau of Investigation (TBI) Special Agent Keith Proctor testified as an expert in forensic science. He identified DNA from Ms. Thornell and her fetus from blood found on the front passenger side fender, rear passenger side door below the trim, and rear passenger side "wheel center". Agent Proctor said the samples he tested did not contain DNA from Mr. Soto.

Before Dr. Christopher Lockmueller, a forensic pathologist, was permitted to testify in the presence of the jury, the trial court conducted a jury-out hearing regarding the Defendant's motion to exclude all fifty-nine autopsy photographs. The Defendant argued that Dr. Lockmueller's testimony was more than sufficient to carry the State's burden of proof and that the danger of unfair prejudice substantially outweighed the probative value of the graphic photographs. The trial court commented that many of the photographs were "extraordinarily prejudicial" and stated that it wanted to limit the photographs to those that were "absolutely necessary." The State responded that "absolute necessity" was not the standard for admissibility and, once the court determined a photograph is relevant, the burden was on the Defendant to show that the photo was "substantially prejudicial."

Dr. Lockmueller explained why the autopsy photographs were needed to aid his testimony. For example, Photograph 47, which depicted a hemorrhaged liver, demonstrated that the fetus was alive at the time of injury. Dr. Lockmueller also stated that multiple photographss of the fetus's dismembered head and left arm would be used to show the identity of the fetus and that the fetus was alive at the time it was

dismembered. The trial court stated, "These are very prejudicial photographs . . . They will have the tendency of inflaming the jury, and I want to get it—I want the Doctor to be able to fully testify but with as few of these photographs as he can get his testimony out." Ultimately, the trial court excluded fifteen of the fifty-nine autopsy photographs, including five of the twenty-three photographs of Mr. Soto, three of the twenty-three photographs of Ms. Thornell, and seven of the thirteen photographs of the fetus, finding that the photographs were cumulative and that any probative value was substantially outweighed by their prejudicial nature.

Before the jury, Dr. Lockmueller described in detail the numerous injuries to each of the victims. He then used multiple autopsy photographs of each victim to illustrate his testimony, but he did not add any substantive explanation of the victims' injuries while the photographs were displayed for the jury. He testified that the twenty-two weeks gestational aged fetus was viable prior to death. He opined that it took "significant blunt force" to tear Ms. Thornell's abdomen. He opined that the cause of death for Mr. Soto, Ms. Thornell, and the fetus was multiple blunt force injuries.

The State asked Dr. Lockmueller about the speed of a vehicle that could cause injuries similar to those suffered by the victims. Following an objection from the Defendant, the trial court held an extensive bench conference, after which the court determined that Dr. Lockmueller could opine, based on his experience and training, as to the speed necessary to cause the injuries to the victims. Based on studies done of the autopsies of pedestrians struck by a vehicle, Dr. Lockmueller opined to a reasonable degree of medical certainty, that an injury such as a transected aorta, which both Mr. Soto and Ms. Thornell had, or the striations, which Ms. Thornell had, did not typically occur in an impact in which the vehicle is "going less than 40 miles per hour."

On cross-examination, Dr. Lockmueller stated he had not personally done any research concerning vehicular speed and injuries. He admitted that a vehicle causing the injuries he described could have been going less than 40 miles per hour and that there was no way to determine the exact speed the Defendant's vehicle was traveling.

Allen Nida, the Defendant's roommate at the time of offense, testified that he heard the Defendant come home after midnight[1] on the morning of the incident. He said the Defendant immediately filled a container with water and then walked outside. When the Defendant came back inside, he called his girlfriend. Mr. Nida could hear tension in the Defendant's voice, so he stopped reading his book and began to listen to the Defendant's telephone conversation. Mr. Nida overheard the Defendant say in a loud

---

[1] Mr. Nida could not give an exact time that the Defendant returned home. Mr. Nida stated that he returned home, himself, "well after [midnight], maybe even 2:00 [a.m.]" and that the Defendant returned to their apartment twenty to thirty minutes later.

- 10 -

voice, "I can't. I am not sober." When the Defendant hung up, Mr. Nida asked him what was wrong. The Defendant said "he thought that he had been in an accident, that he thought that there might have been some people there." Mr. Nida then asked the Defendant if could have hit a deer. The Defendant shook his head no. According to Mr. Nida, the Defendant then made a comment to the effect of, "You know, guys like us we can have eight or nine drinks and, you know, we're still alright [sic] to drive." The Defendant took Mr. Nida to look at his vehicle. There was extensive damage to the right front of the vehicle, and it looked like the car was leaking some fluid. The next day, the Defendant mentioned having his car towed to Johnson City for repairs while the Defendant went to a music festival in Arkansas. Mr. Nida testified that, based on the Defendant's mannerisms and slurred speech, he "had reason to believe" that the Defendant was intoxicated. Mr. Nida also recalled that he had seen a vehicle with its blinker on blocking part of Washington Pike when he came home that night.

On cross-examination, Mr. Nida said the Defendant seemed frightened, scared, and confused when he arrived home. Mr. Nida agreed that, when he gave a statement to the police a year earlier, he reported the Defendant had said, "I had a few drinks" and that he could not tell if the Defendant was intoxicated. Mr. Nida acknowledged that the Defendant did not specify over what period of time he had consumed drinks on the evening of the incident. He also admitted that he did not get along very well with the Defendant.

Elizabeth Stanford testified that she was planning to go to a bluegrass music festival in Arkansas with the Defendant and some friends on the morning of the incident. She spent the prior night at Chance Losher's house on Gratz Street and planned to leave the next morning. After she awoke, she asked Mr. Losher if he wanted to get something to eat, but Mr. Losher refused. Mr. Losher was upset and stated, "Curt got in a wreck last night." According to Ms. Stanford, when the Defendant arrived at Mr. Losher's house that morning, he was visibly upset and "looked like he was in shock." She tried to tell him everything would be all right, but he told her it would not and that he had hit a person. He told her he was going to call his parents and say he hit a deer and then take his car to North Carolina where no one would recognize it and get it fixed. He told her that he had been at The Hill the night before and that he drank a couple of pitchers of beer. Ms. Stanford said she knew the Defendant had also consumed a vodka drink earlier. The Defendant told Ms. Stanford that his tolerance level was fairly high, commenting, "I can drink more than everybody else; like I can handle it." On cross-examination, Ms. Stanford said the Defendant appeared to be in shock. He was sweating and "like no color I've ever seen in anybody before." She also admitted that the Defendant did not tell her how many people shared the pitchers of beer at the Hill.

Leslie Davis testified that Mr. Losher called her the morning of the incident and asked her to stop by his house and "get anything unsavory looking out of [the Defendant's car], you know, like any type of beer cans or anything . . . ." Ms. Davis took some beer cans and a bottle cap or two from the Defendant's car and put them in a garbage bag. She said there was "a case for like a 16-pack of cans . . . that had a couple of empties in it." She said she noticed a lot of damage to the front of the Defendant's vehicle. Ms. Davis said a friend called her later in the day and told her what had occurred.

Brandon Jones was a friend of the Defendant and a roommate of Mr. Losher. He was also planning to go to the music festival in Arkansas. The Defendant had brought over some camping gear the afternoon before the incident and had talked about spending the night at Mr. Losher's house so that the group could leave early. Around 10:00 p.m., Mr. Jones got a text message from the Defendant saying he was going to The Hill. Mr. Jones was awakened around 3:00 a.m. by the opening and closing of the front door. He looked out his window and saw Mr. Losher speaking to the Defendant. Mr. Jones explained that he got up early that morning and drove to his mother's house. He planned to rent a van for the Arkansas trip, and the rental office was near her house. He saw the news story about three people being killed in a hit-and-run by someone driving a white or silver Expedition. After renting the van, he returned to Mr. Losher's house. Mr. Jones testified that Mr. Losher was acting strange and, when he asked Mr. Losher where the Defendant's car was, Mr. Losher told him that the Defendant had wrecked the car the night before. Mr. Jones said when he saw the Defendant's vehicle, "it clicked." He asked Mr. Losher if the Defendant hit those people, and Mr. Losher answered "yes." Mr. Jones confronted the Defendant, and the Defendant admitted that he knew he had hit the victims. Mr. Jones and Mr. Losher told the Defendant he needed to turn himself in. The Defendant said he would, and after making a call, he was picked up by his brother. Mr. Jones described the Defendant as being "very upset; he was crying . . . visibly shaken."

Chance Losher said the Defendant brought him dinner at his place of work the night before the incident and stayed for about thirty minutes. At that time, the Defendant was drinking a vodka and Sprite. Mr. Losher recalled tasting the drink and described it as "fairly strong." Around 11:00 p.m. that evening, the Defendant sent Mr. Losher a text message asking if he wanted to go to The Hill and have a pitcher of beer. Because Mr. Losher had to get up early for the Arkansas trip, he declined the invitation. The Defendant telephoned him around 2:00 or 2:30 a.m. and said that he had a wreck and that he may have hit someone but that he was not sure. Mr. Losher told the Defendant to come over to his house. When the Defendant arrived, he told Mr. Losher that "he looked down while he was driving and he looked up and there was a car in the road and he couldn't avoid it." The Defendant also said "he thought he might have saw [sic] someone jump out of the way but he wasn't sure." Mr. Losher asked the Defendant "if he went to

check on it," and the Defendant said, "[N]o, because he had been drinkin[g]." Mr. Losher said the Defendant was intoxicated when he came to his house around 3:00 a.m. They went to look at the Defendant's vehicle, and Mr. Losher saw that the vehicle was severely damaged on the right front and that there was blood splattered in the wheel well and on the side of the car.

The next morning, before Mr. Losher left with Mr. Jones to get a rental van, the Defendant asked him about using the garden hose. Mr. Losher also gave the Defendant a rag to wash the car. After Mr. Jones and Mr. Losher returned with the rental van, the Defendant called his parents and his brother. Mr. Losher told him that he needed "to deal with this" and thought the Defendant was going to turn himself in. Mr. Losher also testified the Defendant gave differing accounts of how much he had to drink the night before. He recalled that the Defendant said he shared a pitcher or two of beer with his friends at The Hill "[a]nd at some point mentioned wine."

On cross-examination, Mr. Losher said he did not see the vodka bottle or see the Defendant pour vodka into the cup. When he first saw the Defendant at his house, the Defendant was confused and clearly upset. Mr. Losher said he thought the Defendant was drunk based on his speech and mannerisms but that he "did not notice or smell anything." Mr. Losher agreed that he had never seen the Defendant as upset as he was that night. On redirect, Mr. Losher confirmed that the Defendant said, "I was drunk so I just went to my apartment."

### Defendant's Case-in-Chief:

Matthew McGee, a friend of the Defendant, testified that, on the evening before the incident, he was eating dinner at The Hill with his girlfriend and Ryan Blevins when the Defendant arrived. Mr. McGee said he did not see the Defendant drink anything. Mr. McGee left The Hill before the Defendant, and, at that time, there was no question in his mind that the Defendant was sober. On cross-examination, Mr. McGee said the Defendant sat outside at their table the entire time they were at The Hill, that he never saw the Defendant drink anything, and that the Defendant "was fine" when Mr. McGee, his girlfriend, and Mr. Blevins left around 11:00 p.m.

Ryan Blevins testified that he and his girlfriend went to The Hill after work and sat outside on the patio with Mr. McGee and his girlfriend. Mr. Blevins ordered a pitcher of beer and some tacos. He said the Defendant joined them around 10:45 p.m. He said he never saw the Defendant drink anything. When Mr. Blevins left the restaurant around 11:30 p.m., the Defendant was "very coherent." His words were not slurred, his eyes were not glassy, he walked normally, and he was sober and not impaired in any way.

- 13 -

Chase Stubbs testified that he went to The Hill around 10:00 p.m. with Micah Hamilton. He went outside on the patio and saw Mr. Blevins, and they pushed some tables together, talked, drank some beer, ate tacos, and played "corn hole". Mr. Stubbs said the Defendant arrived around 11:00 p.m. and joined them at one of the tables. According to Mr. Stubbs, the Defendant was not drinking when he arrived, and the Defendant did not appear impaired in any way. Mr. Stubbs agreed that the Defendant's eyes were not watery or bloodshot, that his speech was not slurred, and that he appeared "perfectly fine." Mr. Stubbs said the Defendant later ordered a pitcher of beer and that Ms. Hamilton poured a glass from the pitcher. Mr. Stubbs recalled that the Defendant drank "three [beers] at the max" from the pitcher. He said the Defendant left approximately two hours after he arrived and that he "looked completely fine." On cross-examination, Mr. Stubbs said he was not drinking anything other than water that night. On redirect, Mr. Stubbs estimated that the Defendant left around 1:00 a.m.

Micah Hamilton testified that she went to The Hill with Mr. Stubbs around 10:00 p.m. to meet Mr. Blevins, Mr. McGee, their girlfriends, and the Defendant. They went out onto the patio and pushed some tables together. She said the Defendant joined them at their table when he arrived around 10:45 p.m. She said he was not drinking anything at that time. She said the Defendant was "totally normal." She said Mr. Stubbs and the Defendant split a pitcher of beer, and the three of them filled a glass from it. Ms. Hamilton said that this was the only time she saw the Defendant drink. She stated that when the Defendant left The Hill around 1:00 a.m. to go home, he was sober. On cross-examination, Ms. Hamilton said the Defendant had maybe two and a half beers that night. She said by "sober" she meant that the alcohol was not affecting him at all.

Amy Morrow, the Defendant's girlfriend, testified that she received a telephone call from the Defendant around 2:00 a.m. on the morning of the accident. She said the Defendant sounded very frightened and told her it was dark and that he hit something in the middle of Washington Pike. He called back a second time and said his car was heavily damaged and that he did not know what he had hit. She asked him why he left the scene, and he said "I don't know why I left. It's not like I am drunk. I am—it happened so fast and, you know, I panicked, and my car was still moving and I didn't know what to do and I just left."

Scott Reiling, a professional engineer and traffic accident reconstructionist, testified as an expert in the field of accident reconstruction. Mr. Reiling testified that the accident recreation performed by the State was flawed because the driver was alerted to expect something in the roadway. He also said that it cannot be determined from the photographs introduced by the State whether the braking marks that appeared before Ms. Thornell's body were caused by the Defendant's vehicle or whether they were there before the accident. Mr. Reiling also identified a fluid trail coming from the Defendant's

vehicle after the accident. He said the fluid trail continues after the location of Ms. Thornell's body and does not veer around her body. Using Google Earth aerial photographs, Mr. Reiling located where Ms. Tinder's stalled vehicle would have been and the street lights in that vicinity. The street lights were spaced 140 feet apart, and the stalled vehicle was about half way between the two closest streetlights.

Also, Mr. Reiling stated that it was not possible to determine the speed at which the Defendant was traveling based on the damage to his vehicle. Mr. Reiling explained that, because the area of the vehicle that was damaged was made of easily-damaged sheet metal, he could not calculate the energy absorbed by the vehicle. Further, Mr. Reiling noted that, even if he could analyze the damage, his calculations would only show the amount of energy absorbed by the vehicle, and he would not be able to calculate the Defendant's speed based upon that information.

On cross-examination, Mr. Reiling was asked about Dr. Lockmueller's testimony that, based on the injuries to the victims, the vehicle was going at least 40 miles per hour. Mr. Reiling said he disagreed with that opinion because "speed is not force" and a person cannot "accurately judge speed on that kind of analysis." Mr. Reiling admitted that he did not have any medical background.

Dr. David Stafford was qualified as an expert in toxicology. Dr. Stafford opined that if a six foot, one inch, 155 pound man consumed 200 milliliters of vodka at approximately 9:30 p.m. and consumed two to two and one-half twelve-ounce cups of beer around 11:15 p.m., his blood alcohol content (BAC) at approximately 1:40 a.m. would be .05 to .06 at its maximum. On cross-examination, Dr. Stafford agreed that he did not interview any of the witnesses or the Defendant. When asked to estimate what the BAC would be if a man consumed 200 milliliters of vodka at 9:30 p.m. followed by two 48-ounce pitchers of beer, he opined it would be .20. When asked to make the same assumptions and add two, five-ounce glasses of wine, Dr. Stafford opined the blood alcohol content would be .23 after consumption, reduced by the man's metabolism to .18 BAC at 1:40 a.m. Dr. Stafford agreed that impairment starts "as soon as the alcohol gets into the body" and that a person can still be impaired even if their BAC is lower than .08.

The Defendant testified that he grew up in Franklin, Tennessee, and graduated seventeenth in a class of 485 from Centennial High School. After graduation, he was awarded a scholarship to the University of Tennessee. He graduated in eight semesters magna cum laude with a bachelor's degree in plant sciences. He was employed in the genetics lab at the University of Tennessee after graduation and was planning to begin a master's degree program.

On the day before the accident, the Defendant took some camping gear to Mr. Losher's house during lunch and then returned to work. He left work around 5:30 p.m.

and went to his apartment to finish packing for the Arkansas trip. He called Mr. Losher around 8:00 p.m. to see if Mr. Losher wanted to get something to eat. Mr. Losher could not get off work, so the Defendant said he would pick up some sandwiches and bring them to Flashback, the place where Mr. Losher worked. On the way, the Defendant stopped by a liquor store and bought a bottle of vodka. He bought a "big-gulp" orange drink at a convenience store and poured the vodka in the cup. He then bought two sandwiches at Jimmy Johns. He threw the vodka bottle away before going into Flashback around 9:00 p.m. The Defendant said he drank about half of the drink and threw the rest away. He left Flashback about 9:30 p.m. and stopped at Wal-Mart to do some grocery shopping for the Arkansas trip. While checking out at Wal-Mart, he got a text message from Mr. Blevins asking the Defendant to join him at The Hill.

The Defendant arrived at The Hill at approximately 10:50 p.m. and joined his friends on the back patio where they had pulled some tables together. He split a pitcher of beer with Mr. Stubbs and Ms. Hamilton. He said over the two-hour time period he had two or two and one-half cups of beer. He said that, when he left The Hill about 1:15 a.m., he was not impaired in any way.

The Defendant testified that he was very familiar with Washington Pike and drove it multiple times a day. He said the road has pockets of light and dark areas. He said the speed limit on Washington Pike was 35 miles per hour and that he was driving at the speed limit at the time of the incident. The Defendant testified that, as he passed Atoka Lane, he looked up and saw that there was a car in his lane. He did not see a blinker or any lights on the vehicle. The Defendant said he swerved left and heard a loud crash and continued driving. He said he thought he hit the stalled car and that he did not see any people. He said he "freaked out" and pulled over on Alice Bell to look at the damage to his car. The Defendant panicked and went home. After calling his girlfriend, he went outside to look at his car again and saw something that looked like blood. He took a sponge and wiped some of the blood off the car. He said that was the first time he thought he might have hit a person and that he was scared. The Defendant went back inside his residence and called his girlfriend. She asked him why he left the scene, and he told her he was not drunk but that it happened so fast that he just panicked. The Defendant said his roommate overheard the telephone conversation and asked him what was wrong. He told his roommate that he hit a car that and there may have been people involved. The two of them went back outside and looked at the car.

The Defendant then called Mr. Losher and told him he had an accident. He told Mr. Losher that there was a car in his lane and that he swerved but still hit it. The Defendant went to Mr. Losher's residence, and he and Mr. Losher went outside to look at the car, but it was too dark to see much. Mr. Losher told him to spend the night and that they could look at the car in the morning. According to the Defendant, he told Mr.

Losher he had a couple of beers a few hours ago. He denied drinking wine or telling anyone he drank wine. Around 4:00 a.m., he lay down on Mr. Losher's couch. Around 7:30 or 8:00 a.m., he got a text message from Mr. Nida's girlfriend telling him people had been killed. He opened Mr. Losher's laptop, and the information about the accident "popped up." The Defendant then hosed down his car and borrowed Mr. Losher's car to return to his apartment to get some clothes. The Defendant said that when he returned to Mr. Losher's house, he did not know what to do and was "rambling on" about taking his car out of state and getting it fixed. The Defendant's friends, however, told him he needed to turn himself in. The Defendant telephoned his older brother and then his father. He then called his best friend, Ethan Hill, whose father was an attorney. Shortly thereafter, Mr. Hill's father called and told him to go to his apartment and wait. The Defendant said when he got to his apartment there was a message on his phone from an investigator, and he provided the phone number to Mr. Hill's father. The Defendant then called Mr. Losher to ask him to remove some beer from his car that had been in the car for a week. Although Mr. Losher had left for Arkansas, he told the Defendant he would get someone to get the beer out of the Defendant's car.

On cross-examination, the Defendant denied putting on his brakes or swerving around Ms. Thornell's body. He said from the point of impact he just kept driving at 35 miles per hour. After a sidebar conference, the State then asked the Defendant about a prior misdemeanor theft conviction. On redirect, the Defendant explained that he took a pack of Red Bulls when leaving a grocery store and that he later pled guilty to the charge.

Following arguments, the jury convicted the Defendant of the first ten counts in the presentment. The State then introduced a certified record of the Defendant's prior North Carolina conviction for driving under the influence, and the jury convicted the Defendant on Count 11.

The Defendant filed a timely motion for new trial, which was denied. This appeal followed.

## ANALYSIS

### Crime Scene and Autopsy Photographs

On appeal, the Defendant argues that the trial court abused its discretion and committed reversible error when it admitted numerous graphic and gruesome crime scene and autopsy photographs into evidence. Whether the admission of the photographs constitutes reversible error requires a two-step analysis. First, we must determine whether the photographs were relevant to an issue the jury would be required to determine and whether their probative value was substantially outweighed by the danger of unfair prejudice. See Banks, 564 S.W.2d 947, 951 (Tenn. 1978); State v. Collins, 986

S.W.2d 13, 20 (Tenn. Crim. App. 1998). Second, if the trial court abused its discretion and erred in admitting the photographs, we must determine whether such error was harmless. See Banks, 564 S.W.2d at 952-53; Collins, 986 S.W.2d at 21-22.

The record on appeal contains 305 exhibits, most of which were marked for identification before trial. Most of the 305 exhibits were entered as evidence. The first 237 exhibits are color photographs submitted by the State. Exhibits 1 through 59 are photographs taken during the autopsies. Forty-four of the autopsy photographs were entered as evidence. Exhibits 60 through 129 are crime scene photographs. Thirty-nine crime scene photographs were entered as evidence. The photographs were displayed to the jury by projection onto a large screen.

The Defendant filed a motion in limine to exclude the postmortem photographs of the victims, arguing that certain photographs were "gruesome," testimony of the crime scene investigators could provide the location of the victims' final resting places after impact, and the pathologist could provide testimony as to their injuries and cause of death. The State argued that the motion in limine failed to identify specific photographs and that to exclude all postmortem photographs would be improper. Additionally, the State argued that photographs from the crash scene would be essential to the "accident reconstructionist . . . regarding the way the crash occurred or the speeds at which [the Defendant] was traveling," and photographs from the autopsy would be essential to Dr. Lockmueller's testimony "regarding the injuries." The State argued that "[t]hese pictures are certainly relevant, they are not unduly gruesome, they are not unfairly prejudicial, and they are essential to the State proving the case." The trial court deferred ruling on the motion, instructing the Defendant to identify specific photographs that were "objectionable" and the State to address whether the "objectionable" photographs were relevant and whether any gruesome photographs could be shown in a different way.

On the second day of trial after the jury was released, the trial court again addressed the admissibility of certain crime scene and autopsy photographs. The Defendant did not object to crime scene photographs showing the final resting place of the bodies of the victims covered with a tarp. Instead, the Defendant objected to certain photographs on the basis that they were "extremely graphic and gruesome" and to other photographs that were "duplicative." The State argued the photographs were relevant and that the Defendant had the burden to prove that the probative value of each photograph was substantially outweighed by the danger of unfair prejudice. The trial court addressed the State's argument at one point stating, "[T]here's no point just to gross out a jury." Ultimately, the trial court allowed the crime scene photographs which showed the victims' uncovered bodies to be admitted as evidence, stating it would allow the State's expert to go through the crime scene photographs "rather quickly" and explain

what each shows. Concerning the autopsy photographs, the trial court deferred ruling until Dr. Lockmueller was called as a witness.

Crime scene photographs were admitted through several of the State's witnesses. In his testimony, Officer Womac described twelve crime scene photographs, including the following five photographs which the Defendant sought to exclude in his motion in limine:

- Exhibits 75 and 76 showing the final resting place of Ms. Thornell's uncovered body. Although Exhibit 75 shows Ms. Thornell's body from a distance, Exhibit 76 is a much closer view and depicts Ms. Thornell lying partially on her side with a large portion of her intestines coming from the underside of the body and spilling out onto the pavement. Additionally, the photograph shows Ms. Thornell's right leg twisted and bent at an unnatural angle.

- Exhibit 80 showing the final resting place of the severed head and left arm of the fetus in what appears to be a small pool of blood.

- Exhibits 98 and 100 showing the final resting place of two separate "portions" of the placenta.

At a subsequent jury-out hearing on the admissibility of the autopsy photographs, the trial court repeatedly made it clear that it wanted to limit the photographs to those which were "absolutely necessary." The State responded that absolutely necessity was not the standard and that the Defendant had the burden to prove that the prejudicial effect of each photograph substantially outweighed its probative value. Acknowledging the autopsy photographs were "very prejudicial," the trial court stated "[t]hey will have the tendency of inflaming the jury, and . . . I want the Doctor to be able to fully testify but with as few of these photographs as he can get his testimony out." Dr. Lockmueller went through the photographs explaining what they showed and why he thought they were needed to support his testimony.[2] Concerning the photographs of the fetus, he explained he needed the photographs of the head and left arm and the photograph of the rest of the body to show that she was a "viable fetus" before she was "ripped" into two parts by the impact. Defendant's attorney pointed out under the "new Law" the State does not have to prove that the fetus was viable. The State agreed but argued the issue involved more than just viability and that the photographs were needed to prove the fetus was "alive before it was dead." Concerning the autopsy photographs of the fetus, the trial court stated

---

[2] During the hearing, many of the comments about certain photographs did not reference an exhibit number, making it difficult to determine to which exhibit the trial court or witness was referring.

"[t]here is no question in my mind that these are extremely prejudicial." Ultimately, the trial court excluded six photographs as duplicative, and nine other photographs were not offered by the State.

Of the forty-four autopsy photographs admitted, many are extremely graphic and gruesome. Of the eighteen autopsy photographs of Mr. Soto, several are graphic and one, Exhibit 18, is to some extent gruesome. They include:

- Exhibit 17 and 18 show a deep laceration to the top of Mr. Soto's head.

- Exhibits 20, 21, 22 and 23 show significant scrape marks to Mr. Soto's nude body.

Most of the twenty-three autopsy photographs of Ms. Thornell are extremely graphic and gruesome. They include:

- Exhibits 24 and 25 show Ms. Thornell's bloody torso from the front with her outer clothing partially ripped off and, as described by Dr. Lockmueller, the right side of her abdomen is torn with "expelled bowel" visible. Exhibit 24 depicts the area from the gaping wound to Ms. Thornell's abdomen to the top of Ms. Thornell's head. Ms. Thornell's eyes are open and appear to be looking directly into the camera.

- Exhibit 27 shows abrasions to her face and upper torso.

- Exhibits 29, 30 and 31 show a significant wound on the right side of Ms. Thornell's nude body, again with expelled bowel visible and a portion of the intestines extruding through the wound.

- Exhibits 39 and 40 show a significant wound on the right side of Ms. Thornell's nude body from the back, again with expelled bowel visible and a portion of the intestines extruding through the wound.

- Exhibits 42, 45 and 46 show close-up views of the large laceration to the right side of Ms. Thornell's nude body, with portions of the intestines extruding through the wound.

All six of the autopsy photographs of the fetus admitted into evidence are extremely graphic and extremely gruesome:

- Exhibit 47 shows a close-up view taken from the back showing the fetus's exposed liver with hemorrhaging.

- Exhibit 49 shows the body of the fetus, from the back, with the body discolored red from abrasions and with a laceration extending around the right side and the intestines and liver extruding through the wound.

- Exhibit 50 shows the lower half of the body of the fetus, from the back, discolored red from abrasions with the intestines and liver clearly visible.

- Exhibit 56 shows the right side of the head and left arm of the fetus, connected to each other, but severed from the rest of the body.

- Exhibit 57 shows the left side of the head and left arm of the fetus, connected to each other, but severed from the rest of the body.

- Exhibit 58 shows the front view of the head and left arm of the fetus, connected to each other, but severed from the rest of the body.

The transcript reflects that, as Dr. Lockmueller testified about each photograph, the photograph was shown on the projection screen for the jury.

In order to be admitted into evidence, a photograph must be relevant to an issue that the jury must decide. State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005). **"**[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." State v. James, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000)). However, relevant evidence should be excluded if its prejudicial effect substantially outweighs its probative value. Banks, 564 S.W.2d at 951. "[T]he admissibility of photographs lies within the discretion of the trial court," whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. at 949.

Rule 403 of the Tennessee Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403). This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" Collins, 986 S.W.2d at 20 (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)). Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Banks, 564 SW.2d at 951. Evidence which only appeals to the sympathies of the jury, conveys a sense of horror, or "engenders an instinct to punish"

should be excluded. Collins, 986 S.W.2d at 20. Factors to be considered when determining whether the probative value of photographs of homicide victims outweighs their prejudicial effect include:

> [T]he value of the photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

Banks, 564 S.W.2d at 951. "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." Id.

"As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." Collins, 986 S.W.2d at 21 (citing State v. Duncan, 698 S.W.2d 63, 69 (Tenn. 1985)). Photographic evidence may be excluded when it does not add anything to the testimonial description of the injuries. Banks, 564 S.W.2d at 951. Autopsy photographs often fall into this category. Id. This is especially true when the defendant does not dispute the injuries to the victim or cause of death. See Banks, 564 S.W.2d at 952 (autopsy photographs not probative when the defendant did not dispute that the victim's death was caused by multiple wounds to the face and head); Collins, 986 S.W.2d at 21 (autopsy photographs of a newborn not probative when the defendant did not dispute the fact that the baby was full-term and was born alive). If the defendant offers to stipulate to the facts shown in the photograph or the defendant does not dispute the testimony that the photographs illustrate, the more likely the prejudicial effect will substantially outweigh the photographs' probative value. Banks, 562 S.W.2d at 951.

Turing to this case, we acknowledge that the question of whether a photograph is or is not graphic or gruesome is often a subjective determination, and what may be graphic or gruesome to one person may not be so to another. However, at other times a photograph may be so troubling or disturbing that there can be no reasonable question about the graphic or gruesome nature of the photograph. In this case, there is no question that several of the above-listed crime scene and autopsy photographs of Mr. Soto, Ms. Thornell, and the fetus are graphic and gruesome. Nevertheless, we must determine whether the photographs were so graphic and gruesome that their probative value was substantially outweighed by the danger of unfair prejudice.

The Defendant was charged with vehicular homicide, which is defined in pertinent part as the "reckless killing of another by operation of an automobile . . . as the proximate

- 22 -

result of: (1) [c]onduct creating a substantial risk of death or serious bodily injury to a person; [or] (2) [t]he driver's intoxication . . . ." Tenn. Code Ann. § 39-13-213(a)(1)-(2) (2010). The Defendant was also charged with knowingly leaving the scene of an accident, which requires "[t]he driver of any vehicle involved in an accident resulting in injury to or death of any person [to] immediately stop the vehicle at the scene of the accident or as close to the scene as possible" and to "return to and in every event . . . remain at the scene of the accident until the driver had fulfilled the requirements of § 55-10-103." Tenn. Code Ann. § 55-10-101 (2010). As such, the primary issues at trial to which the photographs may have been relevant were whether the Defendant was driving recklessly in such a manner that it created a substantial risk of death, whether he was intoxicated at the time of the incident, and whether he knew or reasonably should have known that death resulted from the accident. See 7 Tenn. Pattern Jury Inst. T.P.I.-Crim. 7.08(a), 7.08(b), 38.14(a).[3]

We turn to the autopsy photographs first. The Defendant did not dispute the victims' cause of death or the extent of their injuries. Dr. Lockmueller gave comprehensive and detailed testimony regarding each victim's injuries before the autopsy photographs were displayed for the jury, and his testimony gives a more detailed description of the nature and extent of the victims' injuries than the photographs do. See Banks, 564 S.W.2d at 952. In fact, once the photographs were displayed, Dr. Lockmueller simply used them to illustrate his prior testimony and did not provide any additional details about the victims' injuries. None of the autopsy photographs depicted a transected aorta, the primary injury Dr. Lockmueller used to formulate his opinion about the speed of a vehicle required to cause such injury. Further, the autopsy photographs were not relevant to the Defendant's level of intoxication. Similarly, the autopsy photographs were not probative to the issue of whether the Defendant knew or should have known that he had hit people as opposed to Ms. Tinder's car. The autopsy photographs were not taken at the crime scene and therefore do not illustrate where the victims were located in relation to the point of impact. Accordingly, the autopsy photographs had minimal probative value, and any probative value they had was substantially outweighed by their prejudicial nature. The trial court clearly abused its discretion when it admitted these photographs.

Likewise, the crime scene photographs that the Defendant objected to were not probative of the Defendant's intoxication level. Although the objectionable crime scene

---

[3] Although the presentment included additional charges against the Defendant—namely reckless endangerment of Sarah Tinder, tampering with evidence, and driving under the influence—neither party argues that the photographs were probative of issues related to those charges. As such, we will confine our analysis of the photographs' relevance to the Defendant's convictions for vehicular homicide by reckless conduct, vehicular homicide by intoxication, and leaving the scene of an accident resulting in death or injury.

photographs may have had some probative value concerning the speed of the Defendant's vehicle, these photographs were not necessary to prove the location of the bodies after impact. The Defendant did not object to several other photographs of the crime scene, some of which depicted the victims' covered by tarps, and detailed testimony and numerous other exhibits explained where the evidence was in relation to the point of impact. The other photographs and evidence coupled with the testimony of the crime scene investigators would provide the jury with the necessary information about the victims' location and at the same time avoid the danger of substantial prejudice caused by seeing graphic and gruesome photographs of the victims' bodies. Both Officer Womac and Dr. Lockmueller testified as to how they concluded that the fetus was expelled from Ms. Thornell's body as opposed to being torn from her abdomen as she was dragged under the vehicle. Such testimony was sufficient for the jury to understand why portions of the fetus and placenta were found near the side of the road as opposed to near Ms. Thornell. Photographs of the fetus's severed head and arm and photographs of the placenta were not necessary to illustrate the fetus's trajectory or final resting place. To the extent that the crime scene photographs show the size of the crime scene and how far Ms. Thornell's body was dragged, a scale diagram of the crime scene was admitted into evidence, and officers testified as to the distance each victim traveled from the point of impact. This testimony provides much more detailed and valuable information than photographs of the victims in their final resting places.

Further, the photographs were not necessary to show that the Defendant knew or should have known that he hit other people. Testimony established that Mr. Soto did a "fender vault" and struck his head against the Defendant's windshield and that the Defendant's anti-lock brake system caused the vehicle to dip and drag Ms. Thornell's body for several yards. Moreover, Mr. Nida, who saw the Defendant minutes after the incident, testified that the Defendant told him that he had been in an accident and "there might have been some people there." This testimony and crime scene photographs that were not objected to were adequately probative of the Defendant's knowledge. The graphic and gruesome photographs of victims' bodies taken at the crime scene posed an obvious and substantial danger of unfair prejudice and were not necessary to prove how the accident occurred. Because other evidence provided the necessary information without the inflammatory nature of the graphic photographs, the prejudicial nature of the crime scene photographs substantially outweighed their probative value. The trial court clearly abused its discretion when it admitted over the objection of the Defendant numerous graphic and gruesome photographs as evidence.

However, determining the photographs were improperly admitted as evidence at trial does not end our inquiry. We must also determine whether the error was harmless. The harmless error doctrine recognizes that the central purpose of a criminal trial is to decide factual questions of a defendant's guilt or innocence, and it promotes the public's

respect for the criminal process by focusing on the underlying fairness of the trial rather than technicalities or "the virtually inevitable presence of immaterial error." State v. Rodriguez, 254 S.W.3d 361, 366 (Tenn. 2008). Improperly admitted evidence is reviewed under a non-constitutional harmless error analysis. State v. Jeff Carter, No. 2009-02399-CCA-R3-CD, 2010 WL 5343212, at *13 (Tenn. Crim. App. Dec. 16, 2010) (citing State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003)). Under this analysis, a defendant must demonstrate "that the error 'more probably that not affected the judgment or would result in prejudice to the judicial process.'" Rodriguez, 254 S.W.3d at 371-72 (quoting Tenn. R. App. P. 36(b)). When assessing the impact of a non-constitutional error, appellate courts must review the record as a whole, considering properly admitted evidence of the defendant's guilt. Id. at 372 (citing State v. Gilliland, 22 S.W.3d 266, 274 (Tenn. 2000)). "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affect the outcome of the trial." Id. (citing State v. Toliver, 117 S.W.3d 216, 231 (Tenn. 2003); State v. Francis, 669 S.W.2d 85, 91 (Tenn. 1984)). Whether an error was harmless "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct." Id. Instead, appellate courts must determine what impact the error may have had on the jury's decision-making. Id.

In this case, we are unable to classify the error as harmless. While the record clearly establishes that the Defendant struck the victims with his vehicle and caused their deaths, there was conflicting testimony as to whether the Defendant was intoxicated at the time of the incident and as to the speed at which the Defendant was driving. As noted above, the challenged photographs were graphic and gruesome, some extremely so. This court has previously noted that "a verdict may often depend on a single item of evidence[.]" Collins, 986 S.W.2d at 22. Based on the inflammatory nature of the photographs and their minimal probative value, we believe their introduction more probably that not affected the jury's judgment and resulted in prejudice to the judicial process. Accordingly, the Defendant is entitled to a new trial.

### "False" Expert Testimony Concerning the Speed of the Vehicle

Next, the Defendant argues that he was denied a fair trial when the State elicited false testimony from Dr. Lockmeuller concerning the speed at which the Defendant was traveling. Specifically, the Defendant contends that Dr. Lockmeuller's testimony "suggesting that [the Defendant] was traveling more than 40 [miles per hour] was false" because it was based on "scientific literature that, by its very terms, did not apply to this accident due to the type of vehicle involved and the manner of impact." Consequently, the jury "was led to believe that there was a scientific basis for concluding that [the Defendant] was speeding when the basis did not exist." Further, the Defendant argues

- 25 -

that the State's failure to provide the Defendant with a copy of the article Dr. Lockmeuller relied on constitutes a violation of Brady v. Maryland, 373 U.S. 83 (1963), and Rule 16 of the Tennessee Rules of Criminal Procedure. The State argues that Dr. Lockmueller's expert testimony was not false and that the State did not withhold any exculpatory evidence from the Defendant. We will address each issue in turn.

### a. False Testimony

At trial, Dr. Lockmeuller testified that he had not conducted any personal research about the minimal speed a vehicle must be traveling in order to inflict the injuries the victims sustained—specifically, that both Ms. Thornell's and Mr. Soto's aortas were transected. However, based on his "experience and education," Dr. Lockmeuller testified that "you begin to see [injuries such as a transected aorta] when a vehicle is going about 40 miles per hour." On cross-examination, Dr. Lockmeuller conceded that it was possible the injuries could have been inflicted by a vehicle traveling less than 40 miles per hour and that there was no way to determine the exact speed the Defendant was traveling based on the victims' injuries.

At a hearing on the Defendant's Motion for New Trial, Dr. Lockmeuller testified that he based his conclusions about the speed necessary to inflict the victims' injuries on a textbook titled Forensic Pathology by Dr. DiMaio and an article entitled Relationship Between Impact Velocity and Injuries in Fatal Pedestrian-Car Collisions by B. Karger, K. Teige, W. Bühren, and A. DuChesne ("the Karger article"). Dr. Lockmeuller explained that the Karger article provided information about the minimal speed a vehicle must be traveling in order to result in "dismemberment" of the victim. Dr. Lockmeuller explained that aortic transections were included in the Karger article's definition of "dismemberment." The abstract of the article stated that "[a]ortic and inguinal skin ruptures are always present if the velocity was about 100 [kilometers per hour] but never occurred below 50-60 [kilometers per hour]." Defense counsel proffered that 50 to 60 kilometers per hour was equivalent to 30 to 35 miles per hour. However, Dr. Lockmeuller pointed to a chart on the next page of the article which showed that the minimum speed necessary to cause an aortic rupture was 63 kilometers per hour or 39.1 miles per hour. Based on the information in the Karger article and the textbook, Dr. Lockmeuller concluded that the Defendant had to be traveling a minimum speed of 40 miles per hour to cause the victims' injuries. Dr. Lockmeuller acknowledged that the victims in the Karger article were struck once in a head-on collision and were not dragged or run over by the vehicle. But Dr. Lockmeuller also clarified that he never testified that either victim was dragged or run over, and he noted that Mr. Soto sustained a transected aorta and the trajectory that Mr. Soto's body traveled suggested that he was not dragged after being hit by the car. In summary, Dr. Lockmeuller testified that he examined the Karger article and the facts of this case, including his knowledge of the

- 26 -

type of car the Defendant was driving, and he concluded that the data in the Karger article could be applied to the instant case.

It is well-established law that "a conviction through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." Napue v. Illinois, 360 U.S. 264, 269 (1959). As such, the State may not knowingly present false testimony, and it has an affirmative duty to correct the false testimony of its witnesses. State v. Giglio, 405 U.S. 150, 154 (1972). In order to be granted a new trial based on the presentation of false testimony, the defendant must establish that "the State presented false testimony, the State knew the testimony was false, and the testimony was material." State v. Cureton, 38 S.W.3d 64, 74-75 (Tenn. Crim. App. 2000). If testimony is determined to be false, this court must determine whether the false testimony could have affected the jury's judgment. Giglio, 405 U.S. at 154 (citing Napue, 360 U.S. at 271).

In this case, we do not believe Dr. Lockmeuller testified falsely at trial. He stated that, based on his knowledge and experience, a vehicle had to be traveling "about 40 miles per hour" in order to transect a victim's aorta. However, he admitted on cross-examination that the vehicle could have been traveling at speeds less than 40 miles per hour and that there was no way to determine exactly how fast the Defendant was traveling based on the victims' injuries. The Karger article listed the speeds at which collisions with different cars caused aortic ruptures, and Dr. Lockmueller noted that the minimum speed on that list was 63 kilometers per hour or 39.1 miles per hour. Based on this information, information from other sources, and the victim's injuries, Dr. Lockmueller concluded that the Defendant was traveling "about 40 miles per hour." Accordingly, the Defendant has failed to establish that Dr. Lockmeuller testified falsely at trial.[4]

Moreover, the Defendant was able to challenge Dr. Lockmeuller's conclusions through cross-examination and his own expert witness. As noted above Dr. Lockmeuller conceded at trial that the victims' injuries could have been caused by a vehicle that was traveling less than 40 miles per hour. Further, the Defendant's own expert, Mr. Reiling, testified that "speed is not force" and that he could not accurately judge the Defendant's speed based on the victims' injuries. Accordingly the Defendant is not entitled to relief on this issue.

---

[4] To the extent that the vehicles studied in the Karger article differed in size and shape from the Defendant's vehicle, such information goes to the weight of the evidence but does not establish that Dr. Lockmeuller testified falsely.

- 27 -

### b. Alleged *Brady* and Rule 16 Violation

The Defendant also contends that the State violated his rights under Brady v. Maryland and Rule 16 of the Tennessee Rules of Criminal Procedure when it failed to turn over a copy of the Karger article prior to trial. The Defendant claims that, had his attorneys known about the Karger article, they would have been able to undermine the State's theory that the victims' injuries provided proof that the Defendant was speeding. The State argues that the trial court properly refused to find that the State withheld Brady material from the Defendant.

In Brady, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 83 U.S. at 87. In order to establish a Brady violation, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). "The prosecution is not required to disclose information that the accused already possesses or is able to obtain . . . or information which is not possessed by or under the control of the prosecution or another governmental agency." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (citing State v. Caldwell, 656 S.W.2d 864, 897 (Tenn. Crim. App. 1983) and Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977)). The defendant must prove, by a preponderance of the evidence, that a Brady violation has occurred. Edgin, 902 S.W.2d at 389.

In order to establish a Brady violation, the evidence need not be admissible; it only needs to be favorable to the defendant. State v. Spurlock, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes evidence that "'provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of events, or challenges the credibility of a key prosecution witness.'" Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting Commonwealth

- 28 -

v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)). Evidence is material under Brady "only if there is a reasonably probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985) (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)). A "reasonable probability" is "a probability sufficient to undermine the confidence in the outcome." Id. (internal quotation marks omitted).

In this case, it is not clear that the Defendant requested Brady material because the record does not contain a motion for discovery from the Defendant. Nevertheless, the Defendant's Brady claim fails because he has failed to establish that the evidence was material. The Defendant claims that, had the Karger article been disclosed before trial, he would have been able to cross-examine Dr. Lockmeuller about the studies contained therein and "undermine . . . his assertion that [the Defendant] was traveling over 40 miles per hour." However, the Defendant was able to do exactly that without the use of the Karger article. During his direct examination, Dr. Lockmeuller explained that injuries such as a transected aorta "have not been seen typically in vehicles going less than 40 miles per hour." But on cross-examination, Dr. Lockmeuller admitted that the vehicle which caused the victims' injuries could have been traveling less than 40 miles per hour and that there was no way to determine the exact speed the defendant was traveling based on the victims' injuries. Further, the Defendant's own expert testified that he could not determine the speed the Defendant was traveling based on the victims' injuries because "speed is not force." Accordingly, the Defendant was able to demonstrate to the jury that the studies Dr. Lockmeuller referenced did not conclusively establish that the Defendant had to be traveling 40 miles per hour or faster in order to inflict the victims' injuries. As such, we do not believe that there is a reasonably probability that, had the Karger article been disclosed to the defense, the result of the Defendant's trial would have been different.

Similarly, we do not believe the State violated Rule 16 of the Tennessee Rules of Criminal Procedure when it did not disclose the Karger article to the Defendant. Rule 16 requires the State, upon the defendant's request, to permit a defendant to inspect and copy books, papers, documents, and other tangible objects if the item is within the State's possession, custody, or control and: (1) the item is material to preparing the defense; (2) the State intends to use the item in its case-in-chief at trial; or (3) the item was obtained from or belongs to the defendant. Tenn. R. Crim. P. 16(a)(1)(F). Further, upon the defendant's request, the State must permit the defendant to inspect, copy, or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if: (1) the item is within the state's possession, custody, or control; (2) the district attorney general knows—or through due diligence could know—that the item exists; and (3) the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial." Tenn. R. Crim. P. 16(a)(1)(G).

- 29 -

Although the Defendant claims that he requested the basis for Dr. Lockmeuller's testimony, he does not provide any citations to the record to show where such a request was made, and the State notes the lack of citation in its brief. The Defendant filed a reply brief, but he again failed to provide a citation to the record showing where he requested the basis for Dr. Lockmeuller's testimony, and he did not seek to supplement the record to include any such request. Based on our review of the record, there is no indication that the Defendant requested the State to disclose anything Dr. Lockmeuller relied upon in preparing his expert testimony. While the record contains the State's "Discovery Response," there is no indication in the record that the Defendant filed a motion for discovery. Further, the technical record includes numerous letters between the State and defense counsel that show the State sent the Defendant supplemental discovery, including Dr. Lockmeuller's autopsy reports for all three victims. However, there is no indication that the Defendant made a request to examine any additional reports, scientific tests, or experiments underlying Dr. Lockmeuller's findings. At trial, Dr. Lockmeuller began to testify about "forensic pathology literature," but the Defendant objected on the grounds that the literature was outside Dr. Lockmeuller's area of expertise. During a bench conference on the objection, the Defendant argued that he had "no way of cross-examining the literature" and that, based on variables such as the size of the vehicle and people involved, the most Dr. Lockmeuller could testify to was "that it was a large force." Once again, the Defendant did not ask to see the literature upon which Dr. Lockmeuller relied. Accordingly, based on the record, it does not appear that the Defendant requested the Karger article under Rule 16, and the State did not violate Rule 16 by failing to disclose the Karger article to the Defendant before trial. Accordingly, the Defendant is not entitled to relief.

## Improper Prosecutorial Comments in Closing Argument

The Defendant argues that the prosecutor made several improper comments during its closing argument. The State argues that the Defendant has waived consideration of the issue by failing to raise a contemporaneous objection and that the Defendant is not entitled to plain error relief.

The Defendant identifies several comments during the prosecutor's closing argument that he claims were improper. First, the Defendant points to a comment that the prosecutor made at the beginning of closing argument while summarizing the facts of the tragic accident. During that summary, the prosecutor stated:

What does Sarah [Tinder] see at this point? That impact as [the Defendant] slams into Chasity Thornell, her unborn baby, and Nelzon Soto with his Explorer. She sees her friend's stomach explode. She sees Nelzon Soto flip over, he'll drag on the ground until it pulls the skin off, that head hit the windshield, the bones cracking, snapping, breaking, her friend being drug

[sic] down the street, the baby ripped from its mother's womb and ripped apart by the shear [sic] brutality of this impact.

The Defendant argues that this comment improperly encouraged the jury to imagine "that Ms. Tinder observed all these horrific injuries as they took place" and view the scene of the accident through her eyes.

Second, the Defendant contends that the prosecutor improperly emphasized holding the Defendant accountable when, at the end of its initial closing argument the prosecutor said the following:

We ask that you find him guilty of each and every charge in that presentment and hold him accountable for the deaths of Mr. Soto, of Ms. Thornell and of her child, for recklessly endangering Ms. Tinder, tampering with that evidence, driving drunk and leaving the scene. Tell him that he has to be accountable for those choices he made. Find him guilty.

Finally, the Defendant argues that the prosecutor improperly attacked defense counsel during rebuttal argument. The prosecutor opened rebuttal argument with this comment:

Several issues that need to be addressed with this. Number one, the victim's name is Chasity Thornell, not Thornhill, not Thornbird—Chasity Thornell. And that's indicative of how little the [D]efendant actually cares about these victims, he doesn't even know their names to correct it. Nelzon Soto, Chasity Thornell and her unborn baby.

The prosecutor then went on to argue that the Defendant did not care about the victims because he did not express remorse or apologize to the families during his testimony. The Defendant contends that it was improper for the prosecutor to "poison the minds of the jury" for his attorney's mispronunciation of Ms. Thornell's name. Additionally, the Defendant argues that his failure to express sympathy for the victims on the stand bears no weight on the question of his guilt or innocence for the charges included in the presentment.

As noted by the State, the Defendant failed to object to any of these comments at trial. On the issue of failure to make a contemporaneous objection, our supreme court has stated:

[W]e stress that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument. A contemporaneous objection provides the trial court

with an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary.

State v. Jordan, 325 S.W.3d 1, 57-58 (Tenn. 2010) (footnote omitted).  Generally, defense counsel's failure to object contemporaneously constitutes a waiver of the issue on appeal.  Tenn. R. App. P. 36(a) (providing that an appellate court need not grant relief when a party failed to take reasonably available action to prevent or nullify an error); see State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that a defendant's failure to object to the State's alleged misconduct during closing argument waives the issue).

However, appellate courts have, in their discretion, reviewed allegations of non-constitutional prosecutorial misconduct under a plain error analysis even in the absence of a contemporaneous objection.  See e.g., State v. Banks, 271 S.W.3d 90, 131-32 (Tenn. 2008) (stating "when flagrantly improper arguments are made, the trial court, with or without objection, should step in and take proper curative action"); State v. Ashley Wheeler, No. W2013-02765-CCA-R3-CD, 2015 WL 1186363, at *3-8 (Tenn. Crim. App. Mar. 11, 2015) (granting relief under "plain error" despite the defendant's failure to raise a contemporaneous objection to the  prosecutor's improper comments or assert the issue in a motion for new trial); State v. Butler, 795 S.W.2d 680, 683 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); see also Tenn. R. App. P. 36(b) (providing that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.")  Plain error has been characterized as error that is obvious or egregious and has been "limited to those [errors] so objectionable that they should have been apparent to the trial judge or that strike at the fundamental fairness, honesty or public reputation of the trial."  United States v. Rodriguez, 882 F.2d 1059, 1064 (6th Cir. 1989).

In State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court listed five factors to be applied to determine when alleged trial error constitutes "plain error":

> 1) the record must clearly establish what occurred at trial; 2) a clear and unequivocal rule of law must have been breached; 3) a substantial right of the accused must have been adversely affected; 4) the accused did not waive the issue for tactical reasons; and 5) consideration of the error is "necessary to do substantial justice."

Adkisson, 899 S.W.2d at 641-42.  In State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000), our supreme court "formally" adopted this analysis, stating that "the Adkisson test provides a clear and meaningful standard for considering whether a trial error rises to the

level of plain error in the absence of an objection[.]" In order to be entitled to plain error relief, all five factors must be established, and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. Further, "'the plain error must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" Id. (quoting Adkisson, 899 S.W.2d at 642). The Defendant bears the burden of persuading the appellate court that the trial court committed plain error. State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

Attorneys have great leeway when arguing a case before the jury, and the trial court has broad discretion in controlling such arguments. State v. Thomas, 158 S.W.3d 361, 412-13 (Tenn. 2005). However, "closing argument must be temperate, must be predicated on evidence introduced during the trial of the case and must be pertinent to the issues being tried." Id. at 413 (citing Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)). This court has articulated five factors to be considered when evaluating the propriety of attorneys' arguments:

(1) The conduct complained of viewed in context and in light of the facts and circumstances of the case[;]

(2) The curative measures undertaken by the court and the prosecution[;]

(3) The intent of the prosecutor in making the improper statement[;]

(4) The cumulative effect of the improper conduct and any other error in the record[;]

(5) The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). To merit a new trial, "the argument must be so inflammatory or improper as to affect the verdict." State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (citing Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)).

Because the prosecutor's role is to seek justice, as opposed to merely advocate, the State is more limited in its argument. Thomas, 158 S.W.3d at 412; Banks, 271 S.W.3d at 130. This court has identified five generally recognized areas of prosecutorial misconduct during closing arguments:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

- 33 -

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (internal citations omitted). Additionally, the State may not "reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." Gann, 251 S.W.3d at 460. Further, although the State may not comment on the consequences of acquittal, the State "may point out the gravity of a particular crime and emphasize the importance of law enforcement." Id. (citing State v. Dakin, 614 S.W.2d 812, 815 (Tenn. Crim. App. 1980); Bowling v. State, 458 S.W.2d 639, 641 (Tenn. Crim. App. 1970)). The State may base its argument on the evidence presented at trial as well as the reasonable inferences drawn from the evidence. Banks, 271 S.W.3d at 131.

Upon review of the alleged improper statements in this case, we conclude that the Defendant is not entitled to relief under plain error. Preliminarily, we note that the Defendant has failed to establish that he did not object to any of the prosecutor's comments for tactical reasons. With regard to the prosecutor's statement about what Ms. Tinder saw, the Defendant has failed to show that a clear and unequivocal rule of law was breached. The evidence at trial clearly proved that Ms. Tinder was present when the victims were struck, and Mr. King recalled that she was frantic, screaming that she told the victims to jump, and saying that she had never seen a car drive that fast. The jury could easily infer that Ms. Tinder saw the event as it happened. Consequently, the prosecutor's comment about Ms. Tinder's witnessing the victims' deaths was based on an inference that was reasonably drawn from the evidence. See Banks, 271 S.W.3d at 131. Accordingly, we do not believe the prosecutor's comment was improper.

Similarly, the Defendant has failed to establish that the prosecutor violated a clear and unequivocal rule of law when it asked the jury to hold the Defendant accountable for his actions. The Defendant has failed to provide any citation to Tennessee law which

states that such comments are improper. As noted above, the State "may point out the gravity of a particular crime and emphasize the importance of law enforcement." Gann, 251 S.W.3d at 460. Moreover, the Defendant has failed to show that the comment was so prejudicial that it affected the outcome of the trial. Taken in context of the State's entire closing argument, it is clear that the prosecutor was asking the jury to return a guilty verdict based on the evidence presented at trial. The prosecutor was not asking the jury to hold the Defendant accountable based on their personal views of him or their emotional reaction to the evidence. As such, we do not believe the prosecutor's comment was improper, and the Defendant is not entitled to relief under plain error review.

The Defendant also argues that the prosecutor made improper comments about the Defendant's failure to express sympathy for the victims or to apologize to their families during his testimony. However, the Defendant does not cite to any authority in his briefs to support this argument, and we are unable to find any case law that supports the Defendant's position. Because the Defendant has failed to provide any citation to authority supporting his claim, he has failed to show that the prosecutor's comment breached a clear and unequivocal rule of law. See Adkisson, 899 S.W.2d at 641-42; Bledsoe, 226 S.W.3d at 355 (stating that the defendant bears the burden of establishing plain error on appeal).

Finally, the Defendant claims that the prosecutor's comment about defense counsel's mispronunciation of Ms. Thornell's name was reversible error. We note that it is not clear what the prosecutor was referring to with this comment. The Defendant did not refer to Ms. Thornell by name during his testimony. Defense counsel only referred to Ms. Thornell once during closing argument, and her name is spelled correctly at that point in the transcript. However, at various points during the trial, defense counsel misspoke and referred to Ms. Thornell as "Miss Thornhill." We interpret the prosecutor's comment during its rebuttal argument to refer to these misstatements. As noted above, the State may not reflect unfavorably on defense counsel during closing argument, and the State may not make arguments designed to inflame the jury. Gann, 251 S.W.3d at 460. Clearly, the prosecutor's argument that a few misstatements made by defense counsel over the course of a days-long trial showed "how little the [D]efendant actually cares about these victims" is not based on the evidence presented at trial or indicative of the Defendant's guilt. We cannot determine why the prosecutor commented on defense counsel's misstatements other than to inflame the jury and prejudice them against the Defendant. The prosecutor's comment was unprofessional and improper. However, we do not believe this constitutes reversible error. The prosecutor made no other reference to the mispronunciation of Ms. Thornell's name. When viewed in the context of the entire closing argument and the rest of the record, we cannot say that this single, isolated comment affected the jury's verdict. See Gann, 251 S.W.3d at 460. Accordingly, the Defendant is not entitled to plain error relief.

**Sentencing**

At the Defendant's sentencing hearing, members of the victims' families read victim impact statements detailing the mental, emotional, and, in some cases, physical impact the victims' deaths had on their lives. Some expressed sympathy for the Defendant's family, and some addressed the Defendant directly to ask him why he did not stop to render help, why he tried to conceal the crime by washing away evidence, and why he did not apologize to them during his testimony.

Mia Niland, the Defendant's former boss, testified that the Defendant was a "very good employee" and that if he were released, she would hire him again. Sam Rogers, a retired University of Tennessee professor, testified that the Defendant majored in plant sciences with a concentration in landscape design and construction. Professor Rogers detailed the types of courses the Defendant would have taken to complete his degree of study. Mr. Rogers noted that the Defendant graduated with a 3.44 grade point average, that he earned grades of A or A- in the classes he took from Mr. Rogers, and that he participated in community volunteering projects organized through the school. Mr. Rogers also noted that the Defendant had expressed interest in pursuing a graduate degree in landscape architecture. David Thomley, the minister of the Defendant's childhood church, testified that the Defendant was very involved in the church while the Defendant was growing up. Mr. Thomley stated that he knew that the Defendant had killed three people and that he had previously had difficulties with alcohol. Despite that, Mr. Thomley thought that the Defendant had the potential for a productive life.

The Defendant made a statement in which he apologized to the victims' families and stated that he wished he could change what happened in the early morning hours of May 30, 2012. He acknowledged that he made "a series of bad decisions" after the incident, which he described as "immature and cowardly." He stated that he knew he would have to live with the pain he had caused for the rest of his life. He asked the court to order a sentence that would allow him to "pay back the community," and he stated that he was "willing to accept whatever sentence [he was] given."

The trial court considered enhancement factors and found that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range and that a victim of the offense was particularly vulnerable because of age or physical or mental disability. See Tenn. Code Ann. § 40-35-114(1), (4) (2010). The trial court noted that the vulnerability of the victim factor could apply to the fetus or to Ms. Thornell because she was hit more than once, but the court also stated that it did not put much weight on that factor.

Turning to the discretionary consecutive sentencing factors, the trial court found that the Defendant "is a dangerous offender whose behavior indicates little or no regard

for human life and no hesitation about committing a crime in which the risk to human life is high." See Tenn. Code Ann. § 40-35-115(b)(4) (2010). As to the manner in which the Defendant should serve his sentence, the trial court found that "confinement [was] necessary to protect society," that "the circumstances surrounding the commission of this offense were egregious, possibly aggravated in this situation," and that confinement was necessary to avoid depreciating the seriousness of the offense. See Tenn. Code Ann. § 40-35-103(1) (2010). Further, the trial court noted that Count 9, leaving the scene of an accident involving injury or death, required a mandatory consecutive sentence.

The trial court imposed the following sentences:

| Count | Charge | Sentence |
| --- | --- | --- |
| 1 | Vehicular Homicide by Intoxication | 11 years |
| 2 | Vehicular Homicide by Intoxication | 11 years (consecutive to Count 1) |
| 3 | Vehicular Homicide by Intoxication | 11 years (concurrent with Count 2) |
| 4 | Vehicular Homicide by Creating a Substantial Risk of Death and Serious Bodily Injury | 6 years (merged with Count 1) |
| 5 | Vehicular Homicide by Creating a Substantial Risk of Death and Serious Bodily Injury | 6 years (merged with Count 2) |
| 6 | Vehicular Homicide by Creating a Substantial Risk of Death and Serious Bodily Injury | 6 years (merged with Count 3) |
| 7 | Tampering with Evidence | 6 years (consecutive to Count 2) |
| 8 | Reckless Endangerment | 11 months and 29 days (concurrent with Count 1) |
| 9 | Leaving the Scene of an Accident Resulting in Injury or Death | 2 years (consecutive to Count 7) |
| 10 | Driving Under the Influence | 11 months and 29 days (merged with Count 11) |
| 11 | Driving Under the Influence (Second Offense) | 11 months and 29 days (merged with Counts 1, 2, and 3) |

In total, the Defendant received an effective sentence of 30 years' incarceration to be served as a Range I standard offender.

Before the trial court adjourned, the court and the State had the following exchange:

> [THE STATE]: And I think you already said this, but just to be clear. You made it that the consecutive sentences were reasonable and related to the theory of the offense?
>
> THE COURT: Absolutely and the depreciation.
>
> [THE STATE]: And that it was necessary to protect the public.
>
> THE COURT: That's correct.
>
> [THE STATE]: Thank you.

On appeal, the Defendant challenges the trial court's imposition of partial consecutive sentences. He argues that the he does not meet the requirements of a "dangerous offender" and that the trial court improperly classified him as such. Further, the Defendant contends that the trial court erred when it simply agreed with the State's comments and did not make specific findings as to why the factors articulated in State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995) applied to the Defendant.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)). So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. Bise, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." Id. at 709. Moreover, under those circumstances, this court may not disturb the sentence even if it had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by

the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2010).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2010); Bise, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." Bise, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401(e) (2010), Sentencing Comm'n Cmts.

The Tennessee Supreme Court has expanded its holding in Bise to trial courts' decisions regarding consecutive sentencing. State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. at 862 (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). Tennessee Code Annotated section 40-35-115 sets forth seven different situations in which a trial court may impose consecutive sentencing, including when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4); see Wilkerson, 905 S.W.2d at 936.

Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." Wilkerson, 905 S.W.2d at 939. In order to limit the use of the "dangerous offender" category to cases where it is warranted, our supreme court has stated that the trial court must make specific findings about "particular facts" which show that the Wilkerson factors apply to the defendant. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). When the trial court "fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority." Pollard, 432 S.W.3d at 863-64. In such situations, this court

may "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." Id. at 864 (citing Bise, 380 S.W.3d at 705 & n.41).

In this case, the trial court noted that this was a serious offense but simply answered in the affirmative when the State asked if it had made the requisite Wilkerson findings. The trial court did not explain on the record why an extended sentence was necessary to protect the public against further conduct by the defendant or why consecutive sentences were reasonably related to the severity of the offense. See Wilkerson, 905 S.W.2d at 939. Further, the trial court failed to identify "particular facts" which supported the finding that the Wilkerson factors applied to the Defendant. See Lane, 3 S.W.3d at 461. Because the trial court failed to identify particular facts to support its findings or explain why the Wilkerson factors applied to the Defendant, the record is insufficient to allow this court to presume that the Defendant was a "dangerous offender" for purposes of consecutive sentencing, and we must apply a de novo standard of review or remand the case to the trial court to reconsider sentencing. See Pollard, 432 S.W.3d at 864. Because the consideration required by Wilkerson involves a fact-intensive inquiry, the better course is to remand the case to the trial court to determine the propriety of consecutive sentencing. See id. However, because we are remanding the case for a new trial, it is unnecessary to also order a reconsideration of the sentence in this case.

## Cumulative Effect of the Errors

Having determined that the trial court abused its discretion and committed reversible error in the admission of certain crime scene and autopsy photographs, it is not necessary to address cumulative error.

## <u>CONCLUSION</u>

For the aforementioned reasons, the judgments of the trial court are reversed, and the case is remanded for a new trial.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 40 -